1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DEWAYNE PRESLEY,                          No.  2:14-cv-1991 GEB GGH P

12                   Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   RAYMOND MADDEN,[1]

15                   Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him

19   on March 4, 2010, in the Sacramento County Superior Court on charges of first degree attempted

20   murder, assault with a firearm, and battery causing serious bodily injury, as well as various

21   enhancements.  (CT 228.)  Petitioner seeks federal habeas relief on the following grounds: (1) the

22   conviction was obtained by violation of the double jeopardy clause; (2) the trial court erred in

23   providing a new instruction to a jury that was deliberating; (3) it was prejudicial error to admit

24   improper expert testimony regarding petitioner's intent to benefit a gang; and (4) "jury was

25   _____

26   [1]  The court grants respondent's request to substitute Raymond Madden, the current warden of
     Centinela State Prison, as respondent in this matter.  See Stanley v. California Supreme Court, 21
27   F.3d 359, 360 (9th Cir. 1994) ("A petitioner for habeas corpus relief must name the state officer
     having custody of him or her as the respondent to the petition."); Rule 2(a), 28 U.S.C. foll. §
28   2254).

                                            1

1  instructed pursuant to a version of an [aider and abettor] instruction whose 'equally guilty'

2  language has since been excised."  Upon careful consideration of the record and the applicable

3  law, the undersigned will recommend that petitioner's application for habeas corpus relief be

4  denied.

5  BACKGROUND

6      In its memorandum and opinion, which was certified for partial publication, the California

7  Court of Appeal for the Third Appellate District provided the following factual summary:

8          Presley and Whitaker III beat and tried to shoot Melvin
           Weathers at the behest of Whitaker, in retaliation for a prior
9          incident in which Weathers had broken Whitaker's jaw. Presley and
           Whitaker III, and a broken rifle, were found near the scene.
10         Whitaker's sister, Beverly Robinson, reported that Whitaker had
           "hyped" up the other defendants into attacking Weathers. Each
11         defendant was a member of the East Side Piru gang. Each
           defendant was convicted of attempted premeditated murder and
12         other charges, and each received a life sentence.

13         After the first jury was selected, the trial court delayed
           swearing in the jury, pending resolution of prosecution witness
14         problems. When those problems were resolved adversely to the
           People, they moved to dismiss the case for lack of evidence. The
15         trial court granted the motion, and the People later refiled the
           charges. Defendants then moved to dismiss the refiled charges,
16         contending that allowing the People to refile the charges improperly
           thwarted double jeopardy protections, and violated due process
17         principles. The trial court denied the defendants' motions, and the
           jury trial ensued.
18
19         In the published portion of this opinion (Part I), we first
           describe the events leading to the dismissal of defendant's first case.
20         Then, as we explain, we assume the trial court erred in finding good
           cause to delay swearing in the first jury, but conclude that this error
21         does not require reversal of the convictions arising from the jury
           verdicts, because defendants have not suffered a double jeopardy or
22         due process violation.

23         In the unpublished portion of this opinion (Part II), we
           describe the facts relevant to the jury trial from which defendants'
24         appeals were taken, and reject all other contentions raised.
           However, we have discovered an error in the abstracts of judgment
25         that must be corrected as to each defendant. Accordingly, we shall
           affirm the judgments and direct the trial court to prepare corrected
26         abstracts of judgment.

27         [The background facts pertaining to the Double Jeopardy and Due
           Process claims will be repeated in that section.]

28

Weathers, age 38, testified he had known Whitaker since they were 16. In December 2007, Weathers "sucker punched" Whitaker in the jaw. About two weeks later, on December 27, 2007, Weathers was attacked by "Wheezy" (Presley), who split Weathers's head. As Weathers struggled with Presley, Whitaker III approached with a long gun. Weathers pushed the gun barrel away, and "that's when he fired on me." Weathers woke up in the hospital. Whitaker's sister, Gwendolyn Davis, had Weathers sign a letter seeking to retract the charges. [N. 11] Weathers thought the attack was in retaliation for his earlier fight with Whitaker. Weathers had identified photographs of Whitaker III as showing the person with the gun, Presley as the person hitting him, and Whitaker as the person he had recently punched.

[N. 11] Davis testified Weathers had asked her to write that letter because he was illiterate.

At the hospital, Weathers told a deputy three men attacked him, including "James Whitaker" (as the deputy had recorded the name) and "Wheezy," who Weathers thought was "James Whitaker's" son, Weathers thought both of these men were "East Side Piru," and "James Whitaker" had told Weathers he had "disrespected him in front of some people," and had told him "I'm going to do something to you[.]"

A neighbor, David Penn, testified he saw two people fighting with Weathers. The taller attacker had a long rifle pointed to Weathers's head, and Weathers was holding the rifle barrel. The taller man tried to chamber a round, then turned the rifle around and clubbed Weathers with the butt several times "Like a golf club[,]" then the two men fled. Penn testified exhibit 51 (in two parts, marked 51-A and 51-B) looked like the rifle he saw the men use, and which broke "after the last hit[.]" Penn had identified the shorter of the two men at a field showup shortly after the incident, but he could not identify that man in court. Deputy Kristen Cook testified Penn had identified Presley.

Constance Goins, Whitaker's sister, denied knowing or having said anything about what happened, but admitted Whitaker was upset at Weathers for breaking his jaw.

Beverly Robinson, also Whitaker's sister, testified she told a deputy what she had heard from others, and denied making specific statements to a detective.

However, Detective Nathan Wise testified he spoke with Robinson on May 22, 2008, and she said people (including her sister, Goins) were mad at her for speaking to the police and wanted her to change her story. Robinson told him she was angry at Whitaker for making her nephew Whitaker III "do his dirty work" for him. Robinson said Whitaker told her son (Kevin Davis) that he had a gun and needed help "handling" Weathers, and Whitaker "might not make it back[.]" Robinson said Whitaker told Whitaker III and Presley "they had to do this for East Side Piru" and the men left after Whitaker "was giving them liquor and pumping them up"

3

shortly before the shooting. Robinson said that Whitaker had told people Robinson was "snitching," and when Robinson had left the courtroom earlier, Detective Wise overheard her say she could not live in Rancho Cordova anymore.

Deputy Charles Gailey testified he spoke to Robinson the day after the incident. Robinson said the police caught two people, but Whitaker got away, and she was mad that he had involved her nephew in the incident. She had been with all three defendants the night before, and Whitaker "hyped them up and talked them into doing his dirty work" for him. Deputy Gailey also spoke with Kevin Davis, who told him the defendants had been drinking together, Whitaker "is a coward and he hyped the other two up and got them to fight his battle" and Whitaker said he had a "chopper" (a gun), and might not make it back. [N. 12]

[N.12] Davis testified he was not with any of the defendants the day before he spoke to a deputy, and he denied making the various statements to the deputy.

Deputy Ian Carver found unfired rifle cartridges and one fired casing near where Weathers was found unconscious. Carver's canine partner "Ike" found Whitaker III and Presley nearby. Another officer testified Whitaker III wore red and black clothing with a "P" on the belt, as typically worn by East Side Piru gang members. Another officer found the rifle about a quarter of a mile away in some bushes, near where the two later-detained men had jumped a fence.

A criminalist testified the rifle found nearby could have been used to "cycle" the cartridges found at the scene, but because of the rifle's poor condition, he was not able to fire it and determine for sure. The barrel was bent and the stock had blood spatters on it, consistent with the rifle having been used as a bludgeon. [N. 13]

[N. 13] Presley's jury heard testimony that Presley's DNA was not found on the rifle.

Detective Burk Stearns testified about his gang expertise. He had particular experience with the East Side Piru members to wear red clothing, and have a "P" on their belts. They strived for respect and reputation, and retaliated against those that impaired their goals. It was important for a member to "[put] in work" for the gang, such as by committing an assault for another gang member. Gang activities included drug sales, homicides, vehicle thefts, assaults, and robberies. Gang violence discouraged victims or witnesses from reporting gang activities or testifying about them.

Stearns "validated" Presley ("Wheezy") as an East Side Piru member based on his arrest while in possession of narcotics and a loaded gun, a "'Chedda Boys'" tattoo (which referred to a subset of the East Side Piru gang), his association with the Whitakers, and his fight with a rival Crip member while in jail. [N. 14] Stearns validated Whitaker III ("Little G") as an East Side Piru member, based on gang tattoos, clothing, the "P" belt buckle, associating

with the other defendants, and information from other law enforcement sources.  [N. 15]  Stearns validated Whitaker ("G") as an East Side Piru member based on the instant crimes, a prior incident involving drug sales while wearing gang clothing in a gang area, and other times Whitaker had worn gang clothing.   In response to a hypothetical based closely on the facts of this case, Detective Stearns opined the incident would be gang-related.  The younger assailants would be putting in work toward enhancing their gang status, and the gang would benefit by signaling that its members cannot be attacked.  In response to a further question, based on an older gang victim's instructions to younger gang members to retaliate, Stearns testified this would bolster his opinion that the later attack was gang related.

[N. 14]  In testimony before the Presley jury, Stearns also referred to documents from Presley's jail cell referring to "Chedda Boys" and other gang subjects.

[N. 15]  The trial court excluded on *Miranda* grounds (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]) a statement by Whitaker III admitting he was a gang member, and also refused to allow the gang expert to rely on that statement.  We express no view on the propriety of the latter ruling.

Detective Stearns was present when Robinson told Detective Wise that she heard Whitaker tell her son (Davis) that Whitaker had a gun and needed help "handling" Weathers.  She also said people were "getting on" her for talking to police, but it was not right for Whitaker to make his son do his dirty work.  Robinson's sister (Goins) had told Robinson to change her story.  Robinson said Whitaker said he might not make it back, he gave the other defendants liquor, and told them they had to do it for East Side Piru.

Presley's counsel partly argued he was intoxicated and that he did not have the intent for aider liability.

Presley's jury found him guilty of attempted premeditated murder, found he personally inflicted great bodily injury, committed the crime to benefit a gang, and that a principal personally used a firearm.  (§§ 664/187), subd. (a), 12022.7, subd. (a), 186.22, subd. (b)(1); see § 12022.53, subd. (e).)  The jury also found him guilty of assault with a firearm and battery causing serious bodily injury (§§ 245, subd. (a)(2), 243, subd. (d)), with various findings, sentences on which were stayed.   The court sentenced him to an unstayed prison term of life (with a parole eligibility period of seven years) plus 13 years.   Presley timely appealed.

(Res't's Lod. Doc. 23 at 2, 213 Cal.App.4th 999, 1002-1003, 153 Cal. Rptr.3d 165 (2013);

Res't's Lod. Doc. 23 at 17-22.)

After petitioner's judgment of conviction was affirmed by the California Court of Appeal,

1   he filed a petition for review in the California Supreme Court.  (Resp't's Lod. Doc. 24.)  The

2   Supreme Court denied the petition without comment or citation on May 22, 2013.  (Resp't's Lod.

3   Doc. 25.)  Petitioner filed a petition for writ of certiorari on the double jeopardy issue with the

4   Supreme Court on August 17, 2013, and it was denied on November 14, 2013.  (Resp't's Lod.

5   Docs. 26, 27.)  On September 15, 2014, petitioner filed a habeas petition with Kern County

6   Superior Court.  (Resp't's Lod. Doc. 28.)  It was denied on October 14, 2014.  (Resp't's Lod.

7   Doc. 29.)  On August 19, 2014, petitioner filed the instant federal habeas petition in this court.

8   DISCUSSION

9   I.  AEDPA Standards

10       The statutory limitations of federal courts' power to issue habeas corpus relief for persons

11   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

12   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

13       An application for a writ of habeas corpus on behalf of a person in
14       custody pursuant to the judgment of a State court shall not be
         granted with respect to any claim that was adjudicated on the merits
15       in State court proceedings unless the adjudication of the claim-

16       (1) resulted in a decision that was contrary to, or involved an
         unreasonable application of, clearly established Federal law, as
17       determined by the Supreme Court of the United States; or

18       (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
19       State court proceeding.

20       For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

21   of the United States Supreme Court at the time of the last reasoned state court decision.

22   Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, ___ U.S.

23   ___, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing

24   Williams v. Taylor, 529 U.S. 362, 405–06, 120 S. Ct. 1495 (2000)).  Circuit court precedent may

25   be instructive in determining what law is clearly established by the Supreme Court and whether a

26   state court applied that law unreasonably.  Stanley, 633 F.3d at 859.  However, circuit precedent

27   may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

28   specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ––– U.S.

1    ——, ——, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ___, 132 S. Ct.

2    2148, 2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so

3    widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

4    be accepted as correct.  Id.

5          A state court decision is "contrary to" clearly established federal law if it applies a rule

6    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

7    precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct.

8    1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

9    may grant the writ if the state court identifies the correct governing legal principle from the

10   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

11   case.[2]  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003); Williams, 529 U.S. at 413;

12   Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may

13   not issue the writ simply because that court concludes in its independent judgment that the

14   relevant state-court decision applied clearly established federal law erroneously or incorrectly.

15   Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro

16   v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not

17   enough that a federal habeas court, in its independent review of the legal question, is left with a

18   'firm conviction' that the state court was 'erroneous.' ").  "A state court's determination that a

19   claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

20   the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct.

21   770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004)).[3]

22   _____

[2]  The undersigned also finds that the same deference is paid to the factual determinations of state

23   courts.  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence

24   presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
     384 F.3d 628, 638 (9th Cir.2004)).  It makes no sense to interpret "unreasonable" in § 2254(d)(2)

25   in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error
     must be so apparent that "fairminded jurists" examining the same record could not abide by the

26   state court factual determination.  A petitioner must show clearly and convincingly that the
     factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969,

27   974 (2006).

28   [3]  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an

7

1   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

2   must show that the state court's ruling on the claim being presented in federal court was so

3   lacking in justification that there was an error well understood and comprehended in existing law

4   beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

5       The court looks to the last reasoned state court decision as the basis for the state court

6   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8   previous state court decision, this court may consider both decisions to ascertain the reasoning of

9   the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

10   "[Section] 2254(d) does not require a state court to give reasons before its decision can be

11   deemed to have been 'adjudicated on the merits.'"  Harrington, 562 U.S. at 100.  Rather, "[w]hen

12   a federal claim has been presented to a state court and the state court has denied relief, it may be

13   presumed that the state court adjudicated the claim on the merits in the absence of any indication

14   or state-law procedural principles to the contrary."  Id. at 784-85.  This presumption may be

15   overcome by a showing "there is reason to think some other explanation for the state court's

16   decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct.

17   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

18   but does not expressly address a federal claim, a federal habeas court must presume, subject to

19   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___,

20   133 S. Ct. 1088, 1091 (2013).

21       When it is clear, however, that a state court has not reached the merits of a petitioner's

22   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

24   F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

25       The state courts need not have cited to federal authority, or even have indicated awareness

26   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362,

27   

28   _incorrect_ application of federal law.'"  Harrington, 562 U.S. at 101, citing Williams v. Taylor,
529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

365 (2002).  Where the state court reaches a decision on the merits but provides no reasoning to

support its conclusion, a federal habeas court independently reviews the record to determine

whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

review of the constitutional issue, but rather, the only method by which we can determine whether

a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief."  Harrington, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims.

Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

just what the state court did when it issued a summary denial, the federal court must review the

state court record to determine whether there was any "reasonable basis for the state court to deny

relief."  Harrington, 562 U.S. at 98.  This court "must determine what arguments or theories ...

could have supported, the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of [the Supreme] Court."  Id. at 786.  "Evaluating whether a rule

application was unreasonable requires considering the rule's specificity.  The more general the

rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.

Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of

federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme

Court has cautioned that "even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166

(2003).

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the

state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting

Harrington, 562 U.S. at 98).

II.  Double Jeopardy and Due Process

Petitioner claims that after the jury was selected and empaneled, the prosecution

convinced the court to delay the jury's swearing in until after a due diligence hearing, which the prosecution lost.  The prosecution then dismissed the case for insufficient evidence, only to re-file it at a later time.  Petitioner argues that even though the jury was not sworn, his double jeopardy and due process rights were violated.

Respondent contends that because the jury was not sworn, double jeopardy did not attach.  For the same reason, respondent argues that petitioner did not have a right to a particular jury, the one that was empaneled but not sworn.

The California Court of Appeal recited the following background and analysis:

> *A. Background*
>
> Defendants initially were charged in case No. 07F19992.
>
> November 6, 2008, was the last day to bring the case to trial, because none of the defendants had waived time. (See Pen.Code, § 1382.) [N. 2] The People announced "ready" for trial, and the case was assigned to the first trial court.
>
> [N. 2] Further date references are to 2008 unless otherwise specified. Further undesignated statutory references are to the Penal Code.
>
> When the trial court asked if the People had any matters to be heard, the People replied that they wanted the trial deemed "commenced" to avoid a speedy trial dismissal, and the parties agreed the trial had indeed commenced. [N. 3] Later, the People conceded that Weathers had not been subpoenaed, but stated they would seek to have Weathers's prior testimony admitted. The trial court lifted the stay of a bench warrant for Robinson, who had been subpoenaed and failed to appear.
>
> [N. 3] For purposes of section 1382, providing a statutory speedy trial right, trial begins when elements "vital to undertaking a trial be present" and the parties are "'ready to proceed[.]'" (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1196–1197, 117 Cal.Rptr.3d 327, 241 P.3d 828; see *Perryman v. Superior Court* (2006) 141 Cal.App.4th 767, 776, 46 Cal.Rptr.3d 306 (*Perryman*) [trial begins "when jeopardy attaches ... or when the litigation of contested issues otherwise begins"].) Had the trial not been deemed started at that time, the People would have had to show good cause for a continuance to secure their witnesses. (*Perryman*, *supra*, 141 Cal.App.4th at pp. 777–778, 46 Cal.Rptr.3d 306.)
>
> On November 12, the People moved in limine to introduce the preliminary hearing testimony of Weathers and Robinson, and the defense sought discovery of efforts made to locate them. The prior testimony could be admitted if and only the People showed those witnesses were "unavailable[,]" which turned on whether the

People "exercised reasonable diligence" to ensure their appearance. (Evid.Code, §§ 240, subd. (a)(5), 1291, subd. (a)(2); see *People v. Bunyard* (2009) 45 Cal.4th 836, 849, 89 Cal.Rptr.3d 264, 200 P.3d 879.)

On Thursday, November 13, the People stated a diligence report would be ready the next court day, Monday, but the defense objected and sought a "live" hearing on diligence. The trial court directed the clerk to have a panel of jurors available on Monday morning.

On Monday, November 17, after the People filed a fourth amended information, the trial court asked if there was "any matter" to address before jury selection, the People said there was not, and jury selection began. Later, defense counsel acknowledged receipt of discovery on diligence.

On Wednesday, November 19, the People presented to the court a deputy's testimony about efforts to find Robinson. Without objection, the trial court continued the diligence hearing to "the most convenient opportunity that we have after we either select the jury or during jury selection[.]" Jury selection continued that day.

On Thursday, November 20, the jurors and alternates were selected but not sworn. The People announced they had additional witnesses to present regarding diligence, and defense counsel referred to an earlier objection to the court's failure to swear the jury. The People's witnesses testified about efforts to locate Robinson and Weathers, and the trial court heard argument on the People's motion.

On Friday, November 21, after the People recalled one witness, the trial court found the People had not shown adequate diligence with respect to either Weathers or Robinson, and denied the People's motion to allow the witnesses' prior testimony to be introduced at trial.

On Monday, November 24, the People moved to dismiss the case for insufficiency of the evidence, in light of the trial court's evidentiary ruling.   (See § 1385.) [N. 4] One defense counsel objected that the dismissal should be with prejudice, alleging the People were "Judge shopping." Another defense counsel stated: "We objected to the lack of swearing in of the jurors ... prior to the selection of the alternates, and we continue to believe that jeopardy should have attached last week[.]"

[N. 4] Insufficient evidence is a valid ground for a section 1385 dismissal, as is a dismissal to allow the People to secure further witnesses. (See *People v. Hatch* (2000) 22 Cal.4th 260, 268–271, 92 Cal.Rptr.2d 80, 991 P.2d 165; *People v. Orin* (1975) 13 Cal.3d 937, 946, 120 Cal.Rptr. 65, 533 P.2d 193.)

The trial court stated it had found "good cause not to swear the jury upon their selection, nor the alternates. [¶] The Court was well aware, as were all counsel, that the People were attempting in

11

various ways to secure the presence of the victim, Lamont Weathers and ... witness Beverly Robinson. [¶] We had not yet concluded the diligence hearing, so there was no firm evidence of what efforts had been discharged by the People in that regard. [¶] So the Court, with that scenario, found there was sufficient cause not to swear the jury." The trial court also stated it had been "anticipating" that the People might not show due diligence.

The trial court granted the motion to dismiss, and later thanked and excused the jurors.

The People refiled the charges on November 26; a second trial court presided over the refiled case.

Each defendant entered a plea of once in jeopardy, moved to dismiss raising due process and double jeopardy grounds, and later raised those issues in their new trial motions. The defense argued the first trial court should not have delayed swearing the jury to allow the People "time to fix the problems in their case" and then allow them to dismiss and refile after they failed to fix those problems. Instead of seeking a continuance before jury selection began (see fn. 3, *ante*), when the People "declared ready, for all purposes, [they took] the risk that [they] would not be able to get [their] witnesses." As a result, defendants were subjected to increased incarceration and lost the opportunity to have that first jury "decide their fate with the evidence that was available to the People at the time, which ... they admit was absolutely nothing."

The People's consistent response was that jeopardy had not attached, and that the first trial court "knew exactly what he was doing in not swearing [in] the jury. He was taking things in a certain order, well within [his] rights."

The second trial court denied the various defense motions, finding that jeopardy had never attached.[N. 5]

[N. 5] We reject the People's claim that defendants were mounting an improper collateral attack on the first trial court's ruling. (Cf. *Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 950–952, 126 Cal.Rptr. 805, 544 P.2d 941.) As defense counsel argued below, the second trial court had a duty to rule on the motions to dismiss, and was not merely reviewing the prior judge's rulings for error as such. By moving to dismiss, defendants preserved their claims. (See *Batts*, *supra*, 30 Cal.4th at p. 676, 134 Cal.Rptr.2d 67, 68 P.3d 357 [" 'a claim of double jeopardy is most appropriately raised by way of a pretrial motion to dismiss' "].)

B. *Analysis*

Before analyzing the specific defense contentions, we first review some general rules about double jeopardy.

"The Fifth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment [citation] ), protects defendants from repeated prosecution for the

same offense [citations], by providing that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb....'" (*People v. Batts* (2003) 30 Cal.4th 660, 678, 134 Cal.Rptr.2d 67, 68 P.3d 357 (*Batts*).) The California Constitution contains a similar provision. (Cal. Const., art. I, § 15 ["Persons may not twice be put in jeopardy for the same offense"].)

In *Downum v. United States* (1963) 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (*Downum*), the parties "announced ready" but, after the jury was sworn, the prosecutor asked for it to be discharged because a witness could not be found. The trial court discharged the jury, and later overruled a plea of former jeopardy. (*Downum*, *supra*, 372 U.S. at p. 735, 83 S.Ct. at pp. 1033–1034, 10 L.Ed.2d at p. 102.)  In reversing the judgment, *Downum* endorsed a Ninth Circuit case on similar facts, holding "'The fact is that, when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance.... The situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict.' " (*Id.* at p. 737, 83 S.Ct. at p. 1035, 10 L.Ed.2d at p. 102, quoting *Cornero v. United States* (9th Cir.1931) 48 F.2d 69, 71.)

*Downum* has been characterized as involving "a particularly unpardonable fault of the prosecutor—unpreparedness." (Schulhofer, Jeopardy and Mistrials (1977) 125 U.Pa.L.Rev. 449, 466.) A later high court case described *Downum* as involving "a defective procedure that would lend itself to prosecutorial manipulation" and where the procedure "operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case." (*Illinois v. Somerville* (1973) 410 U.S. 458, 464, 469, 93 S.Ct. 1066, 1070, 1073, 35 L.Ed.2d 425, 431, 434.)

Thus, it is clear that *had the jury been sworn*, the People would not have been able to legally refile the charges after successfully moving to dismiss them, because double jeopardy principles prevent "a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." (*Green v. United States* (1957) 355 U.S. 184, 188, 78 S.Ct. 221, 224, 2 L.Ed.2d 199, 204–205 ( Green ); see *State v. Stani* (N.J.App.Div.1984) 197 N.J.Super. 146, 151, 484 A.2d 341, 343 ["the State may not retreat from the field when its case turns sour and then be permitted to sally forth on a future day before a new jury when its case is refreshed and reinforced"].) [N. 6]

[N. 6] Of course, if a judge learns a juror is unfit, or for other reasons it is impossible for the trial to continue, the jury must be discharged and a retrial is permitted for "manifest necessity [.]" (*Wade v. Hunter* (1949) 336 U.S. 684, 689–690, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978–979; see *Batts*, *supra*, 30 Cal.4th at p. 679, 134 Cal.Rptr.2d 67, 68 P.3d 357.)

We note a disagreement about the scope of *Green* in the recent divided decision in *Blueford v. Arkansas* (2012) 566 U.S. — —, 132 S.Ct. 2044, 182 L.Ed.2d 937, after a sworn jury failed to

return verdicts. That issue is not germane here.

We now address defendants' specific claims of error.

1. *Abuse of Discretion*

We accept, for purposes of argument, defendants' view that the first trial court abused its discretion by delaying swearing the jury for reasons extrinsic to jury selection.

By statute, after all parties have exercised or passed exercising peremptory challenges, "the jury shall then be sworn, unless the court, for good cause, shall otherwise order." (Code Civ. Proc., § 231, subds. (d) & (e).) The trial court's discretion to find such good cause "will not be set aside absent a clear showing of abuse." (*People v. Niles* (1991) 233 Cal.App.3d 315, 320–321, 284 Cal.Rptr. 423 (*Niles*) [construing former § 1088].) Further, the trial court has the inherent discretionary power "To provide for the orderly conduct of proceedings before it[.]" (Code Civ. Proc., § 128, subd. (a)(3); see *People v. Alvarez* (1996) 14 Cal.4th 155, 209, 58 Cal.Rptr.2d 385, 926 P.2d 365.)

But discretion is always delimited by applicable legal standards, a departure from which constitutes an "abuse" of discretion. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298, 255 Cal.Rptr. 704; see *County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778, 25 Cal.Rptr.2d 681 ["the range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted"].)

Certainly a problem *regarding jury selection* would provide good cause to delay swearing a jury. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 503–504, 84 Cal.Rptr.3d 204 (*DeFrance*) ["There was a real, substantive and objective need to reopen jury selection"]; *Niles, supra,* 233 Cal.App.3d at pp. 320–321, 284 Cal.Rptr. 423 [no abuse of discretion in denying request to reopen to allow peremptory challenge, because the facts about the seated juror had been known before]; *People v. Griffin* (2004) 33 Cal.4th 536, 564–567, 15 Cal.Rptr.3d 743, 93 P.3d 344 (*Griffin*); accord, *In re Mendes* (1979) 23 Cal.3d 847, 851, 153 Cal.Rptr. 831, 592 P.2d 318 (*Mendes*) [after jury proper—but no alternates—sworn, juror excused after she advised that her brother died during the night, and the parties were permitted to select another juror].)

But here, the *sole* reason for not swearing the jury was to avoid the rule of *Downum, supra,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100, because the first trial court anticipated it might rule against the People on their evidentiary motion.

The People provide no authority upholding delay in swearing a jury for reasons *unrelated to jury selection.*

Generally, a trial court abuses its discretion by basing a discretionary decision on improper factors. (See, e.g., *People v.*

14

*Sandoval* (2007) 41 Cal.4th 825, 847, 62 Cal.Rptr.3d 588, 161 P.3d 1146; *People v. Carmony* (2004) 33 Cal.4th 367, 378, 14 Cal.Rptr.3d 880, 92 P.3d 369.) Accordingly, we shall assume for purposes of argument that the first trial court abused its discretion by basing its decision on a factor unrelated to jury selection.

### 2. *Double Jeopardy*

Assuming the first trial court erred by not timely swearing the jury, the result did not violate double jeopardy as such.

The United States and California high courts apply a bright-line rule: In a jury trial, jeopardy attaches when the jury is sworn. (*Crist v. Bretz* (1978) 437 U.S. 28, 37–38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24, 32–33 ( Crist ); *People v. Riggs* (2008) 44 Cal.4th 248, 278, fn. 12, 79 Cal.Rptr.3d 648, 187 P.3d 363 ["once a jury has been sworn, jeopardy has attached" for state and federal double jeopardy] (*Riggs*); *Curry v. Superior Court* (1970) 2 Cal.3d 707, 712, 87 Cal.Rptr. 361, 470 P.2d 345 ( Curry ).)  [N. 7]

[N. 7] There may be a distinction between swearing the jury proper and swearing the alternates. (See *Griffin*, *supra*, 33 Cal.4th at pp. 565–566, 15 Cal.Rptr.3d 743, 93 P.3d 344; *Mendes*, *supra*, 23 Cal.3d at pp. 852–856, 153 Cal.Rptr. 831, 592 P.2d 318; cf. *People v. Cottle* (2006) 39 Cal.4th 246, 254–258, 46 Cal.Rptr.3d 86, 138 P.3d 230; *DeFrance*, *supra*, 167 Cal.App.4th at p. 503, 84 Cal.Rptr.3d 204.) Not surprisingly, the parties express differing views on that point. As resolution of this issue is not necessary to our decision in this case, we need not and do not address it.

Accordingly, the second trial court correctly concluded it was bound to overrule the pleas of former jeopardy, and deny the dismissal and new trial motions to the extent they were based solely on double jeopardy claims. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937 (*Auto Equity Sales*).)

Defendants invite us to "fix jeopardy at the point where the jurors are indeed chosen, viewing the oath as an administrative technicality that has no bearing on the question of jeopardy, except, perhaps, where good cause [to delay swearing the jury] has actually been established and proved." They correctly contend that California courts may invoke independent state grounds to interpret the California Constitution's double jeopardy provision more broadly than the analogous federal provision. (See, e.g., *People v. Hanson* (2000) 23 Cal.4th 355, 97 Cal.Rptr.2d 58, 1 P.3d 650; *People v. Fields* (1996) 13 Cal.4th 289, 297–298, 302, 52 Cal.Rptr.2d 282, 914 P.2d 832 (*Fields*).)

However, our Supreme Court precedent fixes the point of attachment of jeopardy in a jury trial as the time when the jury *is* sworn, not the point it *should have been sworn*. (*Riggs*, *supra*, 44 Cal.4th at p. 278, fn. 12, 79 Cal.Rptr.3d 648, 187 P.3d 363; *Curry*, *supra*, 2 Cal.3d at p. 712, 87 Cal.Rptr. 361, 470 P.2d 345.) We are not free to change that rule. (See *Auto Equity Sales*, *supra*, 57

1     Cal.2d at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

2         However, these conclusions about double jeopardy, in and
      of themselves, do not necessarily resolve defendant's *due process*
3     claims.

4         3. *Due Process*

5         Defendants reimport from double jeopardy jurisprudence
      harms against which that doctrine protects, and claim that the
6     occurrence of such harms deprived them of due process. First, they
      contend they were deprived of their right to be tried by the jury that
7     had been selected and was ready to try the case. Second,
      analogizing to cases of outrageous governmental conduct and
8     prosecutorial misconduct, they accuse the People of manipulating
      the proceedings to secure a second opportunity to muster evidence
9     against them. We are not persuaded by either claim.

10        Before addressing the specifics of these two defense claims,
      we outline some of the purposes served by the double jeopardy rule.
11    Our Supreme Court has stated:

12        "It prevents the state from having a second opportunity to
      marshal evidence which it failed to produce at the first opportunity.
13    It reduces the risk that, by effectively lessening the People's burden
      of proof, an innocent person might be convicted. It protects an
14    accused from the embarrassment, expense and ordeal of a second
      trial." (*Mendes*, supra, 23 Cal.3d at p. 855, 153 Cal.Rptr. 831, 592
15    P.2d 318.)

16        The rule also ensures "that the defendant's right to have his
      fate decided by the first jury empaneled is protected[.]" (*Weston v.*
17    *Kernan* (9th Cir.1995) 50 F.3d 633, 636 (*Weston*).)  [N. 8]

18    [N. 8] Other purposes served by the doctrine have been mentioned,
      but are not relevant to this appeal. (See, e.g., *Fields*, *supra*, 13
19    Cal.4th at pp. 298–299, 52 Cal.Rptr.2d 282, 914 P.2d 832; *Weston*,
      *supra*, 50 F.3d at p. 636.)
20
      We now address defendants' due process claims separately.
21
          a. *Right to a Particular Jury*
22
          Precedent holds that the right to be tried by the particular
23    jury that has been selected is protected by double jeopardy
      principles. (See *Crist*, *supra*, 437 U.S. at p. 36, 98 S.Ct. at p. 2161,
24    57 L.Ed.2d at pp. 31–32 [referring to the "strong tradition that once
      banded together a jury should not be discharged until it had
25    completed its solemn task of announcing a verdict"]; *Downum*,
      *supra*, 372 U.S. at p. 736, 83 S.Ct. at p. 1034, 10 L.Ed.2d at p. 102
26    [referring to the "valued right of a defendant to have his trial
      completed by the particular tribunal summoned to sit in judgment
27    on him" but explaining such right "may be subordinated to the
      public interest—when there is an imperious necessity to do so"];
28    but see *Arizona v. Washington* (1978) 434 U.S. 497, 505 & fn. 16,

98 S.Ct. 824, 830, 54 L.Ed.2d 717, 728 ["a rigid application of the 'particular tribunal' principle is unacceptable" and departing from the ideal does "not invariably create unfairness"].)

However, in these and similar cases, the courts were referring to juries that had been selected and sworn and did not suggest the "particular jury" interest extends any further.

For example, our Supreme Court has held that "a criminal defendant who is in the midst of trial has an interest ... in having his or her case resolved by the jury that was initially sworn to hear the case—and in potentially obtaining an acquittal from that jury. [Citation & fn.] It also follows that in certain circumstances, conduct by the prosecution or the court that results in mistrial, thereby terminating the trial prior to resolution by the jury, may impair that aspect of a defendant's protected 'double jeopardy' interest." (*Batts*, *supra*, 30 Cal.4th at p. 679, 134 Cal.Rptr.2d 67, 68 P.3d 357, emphases added.) And, when addressing cases discussing the " 'particular tribunal' or 'chosen jury' " issue, the high court observed "these cases do no more than determine that jeopardy attaches once a jury and alternates are chosen [citation], and that granting an unnecessary mistrial bars retrial [citation]. They do not stand for the proposition that defendant becomes immune from further prosecution merely because one particular juror is improperly discharged, an alternate substituted, and an actual verdict duly entered." (*People v. Hernandez* (2003) 30 Cal.4th 1, 8, 131 Cal.Rptr.2d 514, 64 P.3d 800 (*Hernandez*).)

Here, defendants were not in the "midst of trial" because they were never placed in jeopardy. Nor do they claim there was anything relatively favorable to them about the first jury, or relatively unfavorable to them about the second juries. [N. 9] Instead, defendants claim that, having completed jury selection, they had the abstract right to have *that jury* and no other decide their fate, based on then-extant evidence.

[N. 9] The jury trial ultimately was conducted with two juries, one for Presley and one for the Whitakers, for reasons irrelevant to this discussion.

However, precedent holds that the right to a "particular" jury applies when and only when a jury has been sworn, and jeopardy has actually attached. (See *Hernandez*, *supra*, 30 Cal.4th at p. 8, 131 Cal.Rptr.2d 514, 64 P.3d 800; *Batts*, *supra*, 30 Cal.4th at p. 679, 134 Cal.Rptr.2d 67, 68 P.3d 357.) We are not free to expand that rule. (See *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.) Accordingly, we must reject the claim that defendants had a due process right to have the first jury decide their fate, before jeopardy had actually attached.

b. *Governmental Misconduct*

We agree with defendants that the People improperly announced "ready" before commencing jury selection, without knowing whether their key witnesses were available, instead of

17

seeking a continuance. (See fn. 3, *ante*.) However, this impropriety does not show intentional manipulation of the proceedings, as opposed to ignorance or neglect. Further, any error was not structural, and defendants fail to show any prejudice flowing from the dismissal and refiling of the charges.

The "extreme" double jeopardy cases are those "in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict,[Fn.] the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this 'abhorrent' practice." (*Arizona v. Washington*, *supra*, 434 U.S. at pp. 507–508, 98 S.Ct. at p. 831, 54 L.Ed.2d at p. 729.)

Here, the People dismissed the first case before jeopardy attached. A prosecutorial dismissal, "if entered before jeopardy attaches, neither operates as an acquittal nor prevents further prosecution of the offense." (*Bucolo v. Adkins* (1976) 424 U.S. 641, 642, 96 S.Ct. 1086, 1087, 47 L.Ed.2d 301, 303; see 1 Torcia, Wharton's Crim. Law (15th ed. 1993) Defenses, § 61, pp. 455–456.)

One learned treatise would add a caveat to this rule: "Although jeopardy attaches in a jury trial only after jury selection is complete and the judge has sworn the entire jury ... pre-jeopardy attempts to terminate the trial and start over may deny a defendant due process *in egregious circumstances*." (6 LaFave, et al., Crim. Proc. (3d ed. 2007) Double Jeopardy, § 25.1(d), p. 588, emphasis added.) And a commentator suggests that the rule that jeopardy attaches when jury is sworn or first witness in court trial testifies "overlooks the very real possibility that successive indictments, though dismissed before trial, may be used as instruments of oppression and may be nearly as vexatious to the defendant as a series of trials." (Comment, Twice in Jeopardy (1965) 75 Yale L.J. 262, 263, fn. 3.) Accordingly, we shall assume but do not hold that prosecution after a pre-jeopardy dismissal might be barred in "egregious circumstances."

By analogy, defendants refer to cases that address the doctrine of "outrageous" government conduct, flowing from due process fairness grounds. (See *People v. Smith* (2003) 31 Cal.4th 1207, 1223–1227, 7 Cal.Rptr.3d 559, 80 P.3d 662 [declining to decide viability of doctrine]; *People v. Wesley* (1990) 224 Cal.App.3d 1130, 1142, 274 Cal.Rptr. 326 [California has "come very close" to applying the doctrine]; *People v. Peppars* (1983) 140 Cal.App.3d 677, 685–687, 189 Cal.Rptr. 879; see generally, 1 Witkin & Epstein, Cal.Crim. Law (3d ed. 2000) Defenses, § 102, pp. 442–444 [describing the muddled caselaw] (Witkin ).) *If viable*, the doctrine is short in reach:

"When conduct on the part of the authorities is so outrageous as to interfere with an accused's right of due process of law, proceedings against the accused are thereby rendered improper. [Citations.] Dismissal is, on occasion, used by courts to discourage flagrant and

shocking misconduct by overzealous governmental officials in subsequent cases." (Boulas v. Superior Court (1986) 188 Cal.App.3d 422, 429, 233 Cal.Rptr. 487, emphasis added.)

Nothing the People did in this case reflects "flagrant and shocking misconduct [.]" The fact their efforts to find key witnesses were found by the first trial court to fall short of satisfying the diligence required under Evidence Code sections 240 and 1291, does not mean the People acted with an *improper motive*.

Further, as defendants concede, had the first trial court declined to delay swearing the jury until the conclusion of the People's evidentiary motion, the People could have immediately moved to dismiss their case against defendants, and refiled it if and when they were able to secure their witnesses. Defendants turn this point around and argue: "Thus, the People made a tactical choice and engaged in gamesmanship from the beginning: they took a risk, and bluffed, and lost." But this does not change the fact that it was within the People's power to move to dismiss before jury selection. The fact that the People participated in jury selection while their evidentiary motion was pending does not reflect flagrant or shocking misconduct.

The defense analogy to cases where a prosecutor *provokes a mistrial* fares no better, because the remedy in such cases is a subsequent fair trial, not dismissal of the charges.

Two mistrial rules apply in California. The first, compelled by federal precedent, provides that, "If a motion for mistrial is granted on the basis of prosecutorial misconduct, the Double Jeopardy Clause does not preclude a retrial unless the prosecutor intentionally provoked the mistrial." (1 Witkin, *supra*, Defenses, § 127, p. 474; see *Oregon v. Kennedy* (1982) 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416.) The second, based on independent state grounds, bars a retrial if a prosecutor commits misconduct to thwart a looming acquittal, "if a court, reviewing all of the circumstances as of the time of the misconduct, finds not only that the prosecution believed that an acquittal was likely and committed misconduct for the purpose of thwarting such an acquittal, but also determines, from an objective perspective, that the prosecutorial misconduct deprived the defendant of a reasonable prospect of an acquittal." (*Batts*, *supra*, 30 Cal.4th at pp. 665–666, 134 Cal.Rptr.2d 67, 68 P.3d 357; see *id.* at pp. 695–697, 134 Cal.Rptr.2d 67, 68 P.3d 357.)

But *Batts* emphasized that "the normal and usually sufficient remedy for the vast majority of instances of prejudicial prosecutorial misconduct that occur at trial is provided under the federal and state due process clause, and calls for either a declaration of mistrial followed by retrial, or a reversal of a defendant's conviction on appeal followed by retrial. The remedy mandated by the double jeopardy clause—an order barring retrial and leading to the dismissal of the criminal charges against the defendant without trial—is an unusual and extraordinary measure that properly should be invoked only with great caution." (*Batts*, supra, 30 Cal.4th at p. 666, 134 Cal.Rptr.2d 67, 68 P.3d 357; see

*Sons v. Superior Court* (2004) 125 Cal.App.4th 110, 121, 22 Cal.Rptr.3d 647 (*Sons*) ["misconduct, even flagrant misconduct, ordinarily is corrected by a fair retrial"].)

Nor have defendants established that this is a case calling for per-se reversal. In cases of federal constitutional error ( *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman*)), per-se reversal is reserved for "structural" flaws, such as "the total deprivation of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial." (*People v. Flood* (1998) 18 Cal.4th 470, 493, 76 Cal.Rptr.2d 180, 957 P.2d 869; see *People v. Aranda* (2012) 55 Cal.4th 342, 363–365, 145 Cal.Rptr.3d 855, 283 P.3d 632.) "If, on the other hand, ' "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." '" (*People v. Mil* (2012) 53 Cal.4th 400, 410, 135 Cal.Rptr.3d 339, 266 P.3d 1030.)

But in this case, the assumed error in failing to promptly swear the first jury is based on the *state-law procedural rule* that a jury should be sworn promptly after selection. (See Part I–B–1, *ante*.) It was not federal constitutional error.

Thus, defendants must show actual prejudice, which they fail to do. Apart from the contentions raised and resolved adversely to them in the unpublished portion of this opinion (Part II, *post*), and the double jeopardy claims we have already rejected, defendants do not contend the second trial was unfair.

We acknowledge that defendants had to undergo two preliminary hearings. But each defendant had appointed counsel for both cases and they do not claim they suffered any increased financial costs because of the dismissal and refiling of charges. [N. 10] Further, there is no claim that they failed to receive full presentence custody credits for any additional jail time as a result of any delay.

[N. 10] Defendants each retained counsel after the jury verdicts, and before sentencing. But defendants do not claim they suffered any additional financial costs because of the dismissal of the first case itself.

Finally, in arguing for reversal, defendants also analogize to statutory speedy trial cases. But in such cases, even where the People have failed to act with diligence, an error in finding good cause is reversible *if and only if the defendant shows a miscarriage of justice at the ensuing trial.* (*People v. Martinez* (2000) 22 Cal.4th 750, 769, 94 Cal.Rptr.2d 381, 996 P.2d 32; *People v. Rodriguez* (1971) 15 Cal.App.3d 481, 484–485, 93 Cal.Rptr. 182; cf. *Perryman*, *supra*, 141 Cal.App.4th 767, 46 Cal.Rptr.3d 306 [ *pretrial* writ relief].)

20

Thus, the second jury trial cured any harm caused by the People's impropriety in announcing "ready" when they were not ready, or by any error in the first trial court's delaying swearing the jury for reasons extrinsic to jury selection. (See *Batts*, *supra*, 30 Cal.4th at p. 666, 134 Cal.Rptr.2d 67, 68 P.3d 357; *Sons*, *supra*, 125 Cal.App.4th at p. 121, 22 Cal.Rptr.3d 647.)

### c. *Conclusion*

Even assuming the first trial court erred in delaying swearing the jury, the result was neither a double jeopardy violation nor a due process violation. And even if we were to find the People engaged in some form of misconduct, no structural error occurred and defendants have not shown that any prejudice flowed from any misconduct. Therefore, there is no basis to reverse defendants' convictions that followed their jury trial.

People v. Whitaker, 213 Cal.App.4th 999, 1003-1014, 153 Cal.Rptr.3d 165 (2013).

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the state through the Fourteenth Amendment, guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. Double jeopardy can occur in three situations: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. Brown v. Ohio, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); see also Turner v. Calderon, 281 F.3d 851, 889 (9th Cir. 2002) (quoting Staatz v. Dupnik, 789 F.2d 806, 808 (9th Cir. 1986)). "Such protections are intended to insure that 'the State with all its resources and power [is] not . . . allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'" Turner, 281 F.3d at 889 (quoting Green v. United States, 355 U.S. 184, 187-88, 78 S. Ct. 221 (1957)). It is well settled that in a jury trial jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 35, 98 S. Ct. 2156 (1978); Serfass v. United States, 420 U.S. 377, 388, 95 S. Ct. 1055 (1975).

Petitioner seems to argue that since the jury was empaneled, and its swearing was delayed due to prosecution tactics unrelated to the jury itself, his double jeopardy rights attached and he had a right to have the first empaneled jury decide his case. (ECF No. 1 at 92.) Here, the simple

1   response is that the jury was not sworn and therefore jeopardy had not attached.[4]

2        There was no error in the finding that good cause existed for granting the prosecution's

3   request for a continuance and dismissing the jury because of the resulting delay.  As one of the

4   witnesses was a victim in the case, there is no doubt as to the importance of that witness'

5   testimony, as well as the testimony of Whitaker's sister, Beverly Robinson.  Furthermore, the

6   record fails to demonstrate any malevolent motive on the part of the prosecution in requesting a

7   delay.  The Court of Appeal correctly noted the prosecution did not know whether their key

8   witnesses were available, but this fact, while possibly showing ignorance or neglect, did not show

9   an "intentional manipulation of the proceedings."  Although the prosecution conceded that it had

10  not subpoenaed Weathers, it had subpoenaed Robinson for trial, but she failed to appear.

11       Moreover, petitioner's double jeopardy and due process rights were not violated in regard

12  to his right to a particular jury.  It is true that a defendant has a right to a particular tribunal as part

13  of the protection against multiple prosecutions.  Wade v. Hunter, 336 U.S. 684, 689 (1949).

14  Nevertheless, such right attaches only when double jeopardy is put in play by the swearing in of

15  the jury.  Crist, 437 U.S. at 35.  Furthermore, even after jeopardy has attached, the right to a

16  particular jury "must in some instances be subordinated to the public's interest in fair trials

17  designed to end in just judgments."  United States v. Jorn, 400 U.S. 470, 480, 91 S. Ct. 547

18  (1971) (citing Wade).  Petitioner argues that Downum v. United States, 372 U.S. 734, 736 (1963)

19  recognized a defendant's right to a particular jury.  Downum, however, was decided squarely on

20  the fact that the jury had been sworn, unlike this case, and it is therefore distinguishable on this

21  important basis.  Id. at 736-37.  The four dissenters to this opinion recognized the importance of

22  the pivotal act of swearing in the jury:  "As I see the problem, the issue is whether the action of

23  the prosecutor in failing to check on the presence of his witness *before* allowing a jury to be

24  *sworn* was of such moment that it constituted a deprivation of the petitioner's rights and entitled him

25  to a verdict of acquittal without any trial on the merits."  Id. at 743 (5-4 decision) (Clark, J.,

26  dissenting) (emphasis added).  Petitioner's other cited case, Oregon v. Kennedy, 456 U.S. 667

27

28  _____
    [4]  Petitioner so concedes as the petition states, "[b]ut because the jury had not been sworn
    jeopardy did not attach."  (ECF No. 1 at 92.)

1  (1982), additionally stands for clearly established Supreme Court authority that a jury must first

2  be sworn before defendant may claim the right to a particular jury.

3       One can be sympathetic to a claim of manipulation here, albeit non-malevolent

4  manipulation.  The prosecution knew it was up against the state speedy trial clock, and it knew

5  that it had not secured the presence of witnesses.  Rather than simply dismiss before jury

6  selection, it desired to hedge its bets, and convinced the trial judge to avoid swearing the jury so

7  that it would know what previous "testimony" would be admitted.  It is possible to envision

8  circumstances where prosecution manipulation of the "swearing requirement" was so outrageous

9  and deliberate that the right to a particular jury would be violated, e,g, no sworn jury awaiting an

10  admissibility ruling on evidence introduced well into the prosecution case in chief.  However, any

11  such argument fails in an AEDPA context for two reasons.  First, the undersigned is unable to

12  locate any established Supreme Court authority establishing that pre-swearing manipulation by

13  the prosecution states a Double Jeopardy problem no matter how characterized.  While there have

14  been suggestions that such manipulation *might* be a different question, see <u>Illinois v.</u>

15  <u>Sommerville</u>, 410 U.S. 458, 464, 93 S. Ct. 1066 (1973); <u>United States v. Pitts</u>, 569 F.2d 343, 347

16  n.5 (5th Cir. 1978), there is no holding of the Supreme Court to this effect.  Indeed, the Supreme

17  Court recently held that the swearing of the jury is a bright line for Double Jeopardy purposes not

18  amenable to circumstantial review.  <u>Martinez v. Illinois</u>, __U.S.__, 134 S. Ct. 2070, 2074-75

19  (2014).

20       Secondly, the California appellate court thoroughly reviewed the "manipulation" issue and

21  found, despite the assumed presence of a state law violation, that no purposeful manipulation

22  occurred.  There is no possible way to term this factual decision as AEDPA unreasonable.

23       Consequently, the undersigned recommends denial of petitioner's first claim.

24  III.  <u>New Jury Instruction During Deliberation</u>

25       Petitioner next claims that he was denied his right to a fair trial when the court provided a

26  new jury instruction to a jury which was already deliberating.

27       The California Court of Appeal rejected petitioner's claim as set forth in the following

28  portion of the opinion:

23

Presley contends the trial court should not have added an instruction on vicarious arming and reopened arguments after his jury began deliberations.  This argument fails to persuade.

During deliberations, Presley's jury sent a note on a Friday asking in part "Is it true that on the offense of personal use of a firearm, we cannot use the argument of aiding and abetting?"  The trial court sent a written reply indicating it would not answer the question without consulting counsel, advising the jury not to speculate about the answer until all counsel could be contacted, and promising "should you determine to recess your deliberations due to this fact it will be promptly addressed on Monday." [N. 19]  Later that day, the jury asked for some testimony to be read back.

[N. 19]  The trial court's response also answered another, unrelated, jury question.

The following Monday, the court reporter read back the requested testimony.  Then the trial court and counsel discussed how to answer the remaining jury question.  The trial court told the jury that "your understanding is correct" and that the jury had to find that Presley "personally used a firearm."  The court referred the jury to CALCRIM No. 3146, already in the jury's instructional "packet," which defined personal use of a firearm during the commission of the charges.

However, the trial court then reinstructed the jury—over Presley's objection—with CALCRIM No. 1402, which had not been given previously, due to "a mistake" as the trial court found.  CALCRIM No. 1402 defines a firearm enhancement where the defendant is a principal in a gang offense and *another* principal in that offense personally uses a firearm.  (§§ 186.22, subd. (b), 12022.53, subd. (e)(1).)  This enhancement had been charged against Presley, but had not been included in the information as read to the jury, and was not referenced by section number in the verdict, only by description.

The parties then gave brief arguments to the jury, which resumed its deliberations.  Presley's jury found that he did not personally use a firearm, but found that he was a principal in a gang offense in which another principal did personally use a firearm.

As the trial court pointed out, by statute a trial court has the power to instruct the jury "At the beginning of the trial or from time to time during the trial[.]" (§ 1093, subd. (f).)  Further, "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from." (§ 1094; see *People v. Valenzuela* (1977) 76 Cal.App.3d 218, 220-221.)  Further, a more general statute provides:  "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044; see, e.g., *People v. Ruiloba* (2005) 131 Cal.App.4th 674, 691 [this

24

statute grants trial courts broad discretion].)

In *People v. Young* (2007) 156 Cal.App.4th 1165 (*Young*), we upheld a trial court's decision to reinstruct a jury after an impasse, stating, "when the court is faced with a deadlocked jury, it must proceed carefully, lest its actions be viewed as coercive. [Citation.]  At the same time, when faced with questions from the jury, including that they have reached an impasse, 'a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least *consider* how it can best aid the jury.'" (*Young*, *supra*, 156 Cal.App.4th at pp. 1171-1172.)  And *People v. Ardoin* (2011) 196 Cal.App.4th 102 (*Ardoin*), upheld a trial court's discretion to give a supplemental instruction on felony murder in response to a jury question, but found the trial court erred harmlessly by not reopening to allow defense counsel to provide argument about that new instruction. (*Ardoin*, *supra*, 196 Cal.App.4th at pp. 127-134.)

Here, we find no abuse of discretion.  Although Presley's jury did not report an impasse, or ask about the *precise* issue leading to the supplemental instruction, in ascertaining how to respond to a jury question related to another firearm enhancement, the trial court discovered a critical omission in the instructions.  The trial court properly gave a supplemental instruction, in order to insure the jury would fairly resolve all pleaded issues.

Further, as Presley concedes, both counsel were allowed to argue about that supplemental instruction to the jury.  Contrary to Presley's speculation, we will not presume that the jury gave undue importance to the supplemental instruction over all other instructions, nor assume that the supplemental instruction undermined the arguments already given.

In our view, the trial court's action furthered the ultimate goal of the trial, which was to ascertain the truth.  (§ 1044.)  We find no abuse of discretion on this record.

Presley also asserts the prosecutor intentionally withdrew liability under section 12055.23, subdivision (e), for tactical reasons, and claims the charge should not have been resurrected by the trial court's reinstruction.  But the trial court considered the prosecutor's explanations and found the issue arose due to a mistake.  Later, after Presley's newly-retained counsel raised the issue in a new trial motion, the trial court again rejected the claim that the prosecutor had withdrawn the instruction for tactical reasons, telling Presley's new counsel:  "I understand you're at a disadvantage because you weren't there, but that didn't happen."

We will not reweigh the evidence to contradict the trial court's finding about the prosecutor's motives.  (See *People v. Riccardi* (2012) 54 Cal.4th 758, 787 [in reviewing alleged bias in jury selection "the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations"].)

1    (Res't's Lod. Doc. 23 at 31-34.)

2            In general, a challenge to a jury instruction solely as an error of state law does not state a

3    claim cognizable in a federal habeas corpus action.  See Waddington v. Sarausad, 555 U.S. 179,

4    192 n. 5, 129 S. Ct. 823 (2009) ("we have repeatedly held that 'it is not the province of a federal

5    habeas court to reexamine state-court determinations on state-law questions,'" quoting Estelle v.

6    McGuire, 502 U.S. 62, 67–68, 112 S. Ct. 475 (1991)); see also Gutierrez v. Griggs, 695 F.2d

7    1195, 1197 (9th Cir. 1983); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  The

8    standard of review for a federal habeas court "is limited to deciding whether a conviction violated

9    the Constitution, laws, or treaties of the United States."  Estelle, 502 U.S. at 62.  In order for error

10   in the state trial proceedings to reach the level of a due process violation, the error had to be one

11   involving "fundamental fairness."  Id. at 73.  The Supreme Court has defined the category of

12   infractions that violate fundamental fairness very narrowly.  Id.

13           In order to establish a due process violation, petitioner must show both ambiguity in the

14   instructions and a "reasonable likelihood" that the jury applied the instruction in a way that

15   violates the Constitution, such as relieving the state of its burden of proving every element

16   beyond a reasonable doubt.  Waddington, 555 U.S. at 190, 129 S. Ct. at 831.  Petitioner must

17   show that the ailing instruction by itself so infected the entire trial that the resulting conviction

18   violates due process.  Estelle, 502 U.S. at 72.  Additionally, the instruction may not be judged in

19   artificial isolation, but must be considered in the context of the instructions as a whole and the

20   trial record.  Id.  The court must evaluate jury instructions in the context of the overall charge to

21   the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169,

22   102 S. Ct. 1584 (1982).  Furthermore, even if it is determined that the instruction violated the

23   petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional

24   instruction had a substantial influence on the conviction and thereby resulted in actual prejudice

25   under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710 (1993), which is whether the

26   error had substantial and injurious effect or influence in determining the jury's verdict.  See

27   Hedgpeth v. Pulido, 555 U.S. 57, 61–62, 129 S. Ct. 530 (2008) (per curiam).

28           The state appellate court's determination is neither contrary to nor an unreasonable

1   application of controlling Supreme Court law. First, this court will not revisit the Court of

2   Appeal's determination that giving the instruction was not an error of state law.  A further

3   instruction was necessary to clarify the instruction previously given which concerned a separate

4   theory of liability, personal use, as compared to vicarious liability through gang affiliation, which

5   was necessary to give in a separate instruction.  When a jury presents a question in order to clarify

6   its difficulties, the court "should clear [the jury's difficulties] away with concrete accuracy."

7   Bollenbach v. U.S., 326 U.S. 612, 612-613, 66 S. Ct. 402 (1946).  "[T]he district court has the

8   responsibility to eliminate confusion when a jury asks for clarification of a particular issue."  U.S.

9   v. Hayes, 794 F.2d 1348, 1352 (9th Cir. 1986).  The court has discretion to choose the manner in

10  which it fulfills this obligation.  Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir. 1970);

11  United States v. Collom, 614 F.3d 624, 631 (9th Cir. 1979).  Questions or disputes which arise as

12  a result of questions during jury deliberations should be resolved by the court after consultation

13  with counsel, in supplemental instructions.  See U.S. v. Birges, 723 F.2d 666, 670-71 (9th Cir.

14  1984).  Furthermore,

15
16          [b]ecause the jury may not enlist the court as its partner in the fact-
            finding process, the trial judge must proceed circumspectly in
            responding to inquiries from the jury. The court may properly
17          attempt to avoid intrusion on the jury's deliberations by framing
            responses in terms of supplemental instructions rather than
            following precisely the form of question asked by the jury.
18

19  United States v. Walker, 575 F.2d 209, 214 (9th Cir. 1978).  See also Arizona v. Johnson, 351

20  F.3d 988, 994 (9th Cir. 2003); United States v. Nunez, 889 F.2d 1564, 1569 (6th Cir. 1989)

21  (although a trial court "must respond to questions concerning important legal issues," it "must be

22  careful not to invade the jury's province as fact-finder").

23          The trial court properly determined to respond to the jury's question by answering it

24  directly, and by giving another instruction relating to a separate count (Count 1) in the complaint.

25  (RT. 1885-92.)  Both counsel were permitted to provide argument to the court about the new

26  instruction before it was given, (RT. 1870-1886), *and* to the jury at the time the new instruction

27  was given.  (RT. 1894-95.)

28          Petitioner's counsel, in arguing to prevent the additional instruction from being given,

27

1    emphasized the prosecutor's decision, over numerous meetings and communications and on the

2    prosecutor's own request, to withdraw the vicarious arming allegation from consideration based

3    on a tactical decision.  Therefore, defense counsel argued, both sides did not argue the issue of

4    vicarious use of a firearm during the trial.  Defense counsel objected to the reintroduction of these

5    allegations to the jury during the middle of trial.  (RT. 1873-79.)  The court heard this argument,

6    as well as argument from the prosecution that the instruction given in regard to section

7    12022.5(3)(e), instruction number 402, was legally incorrect as written, and it would not apply to

8    petitioner.  Therefore, the prosecution argued, it was not a tactical decision on his part to give a

9    supplemental instruction on vicarious liability for firearm use by another gang member, but rather

10   to provide a legally correct instruction.  (RT. at 1879-80.)  The prosecution argued that this

11   instruction would require no new evidence whatsoever.

12       The court then provided its reasoning, based on the judge's own research.  First, the judge

13   provided authority for his discretion to provide a new instruction during the course of the trial.

14   (Id. at 1881.)  Next, he addressed the legal error in the firearm instruction that was previously

15   given, as pointed out by the prosecution, and noted that with three defendants, two juries, two sets

16   of jury instructions, and three verdict forms, such a mistake could be made.  (Id. at 1882.)  He

17   then posited that the instruction previously given would cause confusion to a jury because aiding

18   and abetting does not apply to it, and it requires personal use.  The court seemed to imply that

19   confusion would naturally occur because there was no evidence of personal use of a firearm by

20   petitioner.  (Id. at 1883.)  Since the new instruction involved a "completely distinct legal matter,"

21   asking only whether petitioner was a principal in a gang offense and whether another principal in

22   the gang personally used a firearm, it could not affect the credibility of petitioner's counsel and

23   therefore would not prejudice petitioner in regard to argument already made.  (Id. at 1883.)  The

24   court did not accept the defense argument that the prosecution made a tactical decision to leave

25   out this instruction and then request it during deliberations.  The judge pointed out that the

26   prosecution during trial had argued consistently with its position on the enhancement, as had the

27   defense, and had not wavered in its position.

28       Both sides had the opportunity to present evidence to support and refute the allegation that

the crimes were committed for the benefit of the gang, and that Whitaker, in the same gang,

personally discharged the firearm.  (Id. at 1883-84.)  The judge concluded:

> So my point is, I'm sure – it may have been mistaken, but I'm sure it wasn't tactical because there's been no tactical advantage to anyone, nor can there be, unless [the prosecutor] abandons the case he's been arguing all the way through.
>
> As far as a concern that if they are given the additional instruction that was omitted the other day, and the inquiry is added to the jury form on Count 1, that that somehow makes the argument that was advanced with respect to the B count less credible is one that, you know, I understand the advocacy that underlies it, but I can't connect the two.  We're talking about two complete different theories of liability, where in one case we're asking did he personally use – did your client personally use a firearm, and we're going to tell them that means personal.  The other one doesn't ask if he personally used a firearm, it asks if somebody else did.  And again, those are two completely different things.
>
> So I have to admit that I don't see the potential for prejudice to anyone here.  In fact, the jury's going to be advised in a minute that you were exactly right in terms of the absence of aiding and abetting on the B count.
>
> So all that having been said, the Court is going to find that by virtue of its inclusion in the Complaint; by virtue of it not being abandoned on the record; and by virtue of the Court's finding, after considering all of this, that this wasn't some sort of tactical decision, it was a mistake that was made in connection with the assemblage of a very long series of jury instructions, including the inquiry as a sub-inquiry to the street gang allegations, which is the last one on Count 1, I'm going to give the jury 1402.  I'm going to allow counsel the opportunity to argue anything they wanted to about it, and I'm going to include the inquiry on an amended Count 1 that goes back with them.

(RT. 1884-85.)

The supplemental instruction permitting a firearm enhancement where the defendant is a principal in a gang offense and a different principal personally uses a firearm, was a legally accurate instruction and was mistakenly omitted from the original instructions with no malicious motivation on the part of the prosecution.  Petitioner's argument that the prosecutor made a tactical decision to originally omit the instruction and that it was not a mistake, is based on pure speculation.  Petitioner has presented no facts supporting this assertion, and there is no evidence of misconduct by the prosecutor.  Nor are the circumstances so suspicious that a reasonable jurist would probably conclude that the prosecution was manipulating procedure for tactical reasons.

29

1    The jury instructions in this case were not problematic as they were in <u>Bollenbach</u>, which

2  is distinguishable.  In that case, the judge gave a cursory supplemental instruction in response to a

3  jury instruction which was described on review as "mistaken" and "simply wrong."  326 U.S. at

4  611, 613.  The Supreme Court in that case did caution that supplemental jury instructions given in

5  response to the jury's mid-deliberations can have a greater impact than initial instructions.  <u>Id.</u> at

6  612 ("Particularly in a criminal trial, the judge's last word is apt to be the decisive word").

7  <u>Bollenbach</u> was decided on its specific facts which are not to be found in this case:  the question

8  from the jury had "clearly indicated that the[y] were confused," the judge's response was cursory

9  and inaccurate, and included "a plain hint from the judge that a verdict ought to be forthcoming."

10  <u>Id.</u> at 612–13. The jury returned with a guilty verdict only five minutes later.  <u>Id.</u> at 610.  The

11  Supreme Court held that where a supplemental instruction "is a specific ruling on a vital issue and

12  misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge."

13  <u>Id.</u> at 612 (emphasis added).

14    In petitioner's trial, however, although the jury expressed limited confusion as evidenced

15  by its submission of a question about vicarious arming, its confusion was limited to this issue of

16  the original firearm instruction, albeit the "new" instruction was an indirect result of the initially

17  expressed confusion.  Nor did the trial judge give a misleading or inaccurate response to the

18  jury's question, but gave both an answer and a separate instruction which clearly clarified the

19  issue.  The judge did not suggest that a verdict should be forthcoming, and the jury did not return

20  a verdict until a few hours later.  (RT. 1898-1900, 1962-63.)  <u>Bollenbach</u> is inapplicable, and no

21  relief can be granted on this claim.

22    Petitioner desired a windfall from the mistake here, and the failure to receive the "gift"

23  does not constitute substantial harm.  One can imagine that a trial judge could get involved in

24  rectifying so many of the prosecution's mistakes that he loses the status of a neutral judge.

25  However, that is a different claim than the one presented here, and the facts are far from the limit

26  of a trial judge's discretion to ensure that both sides are treated fairly.

27  IV.  <u>Gang Expert Testimony</u>

28    Petitioner next claims that his due process rights were violated when a gang expert was

1  permitted to testify regarding petitioner's intent to benefit a gang.  Specifically, petitioner claims

2  that although the prosecutor phrased his question to the expert as a hypothetical, the detective's

3  responses were not within the hypothetical, but were based on the facts of this case, including his

4  opinion that this case was a gang related offense.  Petitioner claims that the law permits

5  hypotheticals in these situations, but does not permit questions directly pertaining to a defendant,

6  citing <u>People v. Xue Vang</u>, 52 Cal.4th 1038 (2011).  The California Court of Appeals cited this

7  case, and in fact relied on it in discussing this claim as follows:

8
   Defendants contend Detective Stearns, the prosecution's
9  gang expert, improperly gave ultimate issue testimony and
   improperly referred to them personally in answering hypothetical
10 questions.  We find no error.

11     Detective Stearns testified at an in limine hearing (see Evid.
   Code, § 402) about his gang expertise, including with the Rancho
12 Cordova East Side Piru Blood gang.  "Little Gene" (Whitaker III)
   was a member, as shown by his juvenile record, tattoos, and
   clothing.  "Big G" (Whitaker) was a member, based on clothing,
13 prior arrests, and this incident.  So was "Wheezy" (Presley), based
   on tattoos, self-admissions, arrest history, and associations.  This
14 incident was gang related.

15     At trial, Detective Stearns was asked hypothetical questions,
   as we have summarized *ante*.  The trial court twice admonished the
16 jury about an expert's ability to rely on hearsay material, and
   admonished that the gang evidence could not be used to show
17 criminal propensity.  In addition to these admonishments, the juries
   were instructed on the proper use of expert evidence and
18 hypothetical questions (see CALCRIM Nos. 332, 1403), and
   defendants do not fault these instructions or admonishments as
19 such.

20     In Detective Stearns's opinion, the younger assailants would
   be working toward enhancing their gang status, at the behest of the
21 older gang member who had been attacked, and the gang as a whole
   would benefit by signaling that its members cannot be attacked
22 without retaliation.

23     In contending Detective Stearns's testimony should have
   been excluded, defendants generally rely on a broad interpretation
24 of *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*),
   asserting that it holds a gang expert cannot answer hypothetical
25 questions about intent.  (AOB 73, 79; ARB 27-28)  We disagree.

26     Our Supreme Court has rejected *Killebrew*, to the extent it
   can be read so broadly.  (*People v. Vang* (2011) 52 Cal.4th 1038
27 (*Vang*) [in part clarifying and in part disapproving *Killebrew*]; see
   also *People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3 ["It
28 would be incorrect to read *Killebrew* as barring the questioning of

expert witnesses through the use of hypothetical questions regarding hypothetical persons"]; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513.)   "To the extent that *Killebrew, supra*, 103 Cal.App.4th 644, was correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason, fn the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case.  'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.'  [Citations.]  Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper."  (*Vang*, *supra*, 52 Cal.4th at p. 1048.)

Defendants complain that Detective Stearns referred to "the older defendant" who directed "the two younger defendants," and also referred to one "individual" who said, "This is on East Side Piru[.]"   Their point is that these specific references effectively eliminated the hypothetical nature of the expert testimony.

However, as the People point out, no objection to this nomenclature was lodged.   In any event, the juries would understand the expert was speaking hypothetically.

Moreover, it was proper to tether the hypothetical closely to the facts, indeed, it was *essential* to do so:  "[H]owever much latitude a party has to frame hypothetical questions, the questions must be rooted in the evidence of the case being tried, not some other case.  [¶]  The reason for this rule should be apparent.  A hypothetical question not based on the evidence is irrelevant and of no help to the jury."  (*Vang*, *supra*, 42 Cal.4th at p. 1046.)  To preclude a hypothetical question because it is thinly disguised from the actual facts transforms the *requirement* that a hypothetical question be rooted in the evidence into a prohibition – or at least into the confounding rule that the party posing the question must disguise from the jury the fact it is rooted in the evidence – not 'thinly,' it appears, but thickly."  (*Vang*, *supra*, at p. 1046.)

Defendants also fault Detective Stearns for trying "to sneak in an inadmissible opinion" by referring to "a prior incident between G and the victim."  But the trial court sustained a prompt objection, and the prosecutor directed the witness to stay "within the hypothetical[.]"  This stray passage does not support the claim that Detective Stearns acted with improper motives in testifying.

Finally, defendants cursorily contend the evidence violated federal due process.   We disagree.   "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose."  (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v Partida* (2005) 37 Cal.4th 428, 439.)  Defendants claim that *because* the evidence was inadmissible under state law, its introduction violated due process.  However, as we have explained, as admission of the

1    evidence did not violate *state* law, defendant's federal claim fails.

2    (Res't's Lod. Doc. 23 at 26-28.)

3    Petitioner's claim that the prosecution's gang expert testimony was based on an ultimate

4    issue, petitioner's intent to benefit a gang, is one that arises out of state law, and is not cognizable

5    on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S. Ct. 475 (1991). In

6    order for the testimony to implicate petitioner's constitutional rights, an error must have so fatally

7    infected the proceedings as to render them fundamentally unfair. Jammal v. Van de Kamp, 926

8    F.2d 918, 919–20 (9th Cir.1991). In the context of admission of erroneous, prejudicial evidence,

9    it is an open question whether the Supreme Court has ever made a holding that such violated due

10   process. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

11   Furthermore, there is no Supreme Court authority establishing that it is erroneous to

12   permit an expert to testify concerning an ultimate issue of fact. Moses v. Payne, 555 F.3d 742,

13   761 (9th Cir. 2009). The Ninth Circuit has recognized, however, that "[i]t is well-established ...

14   that expert testimony concerning an ultimate issue is not per se improper." Hangarter v.

15   Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (citation omitted). "A

16   witness is not permitted to give a direct opinion about the defendant's guilt or innocence," but "an

17   expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact."

18   United States v. Lockett, 919 F.2d 585, 590 (9th Cir. 1990) (internal citation omitted). See Fed.

19   R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

20   Moreover, as the appellate court reasoned, not only was petitioner's jury twice

21   admonished about an expert's reliance on hearsay material, (RT. 1491, 1526), and further

22   admonished not to consider the gang testimony as evidence of general bad character of a

23   defendant and propensity to commit the crimes in this case, (RT. 1526), the court also instructed

24   the jury at length on proper use of expert testimony and hypothetical questions. (RT. 1544, 1752-

25   53, 1755, 1783). The jury is presumed to follow the court's instructions and admonitions. See

26   Francis v. Franklin, 471 U.S. 307, 324 n. 9, 105 S. Ct. 1965 (1985) (the Supreme Court

27   "presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular

28   language of the trial court's instructions in a criminal case and strive to understand, make sense

33

1    of, and follow the instructions given them").

2          Detective Stearns' testimony regarding whether the crime was committed for the benefit

3    of a criminal street gang is perfectly appropriate for other reasons also.  First, it is important to

4    ask whether expert opinion testimony would assist the jury.  See People v. Prince, 40 Cal.4th

5    1179, 1222, 57 Cal.Rptr.3d 543, 156 P.3d 1015 (2007), cert. denied, 552 U.S. 1106, 128 S. Ct.

6    887 (2008).  Second, the court has much discretion in determining whether to admit expert

7    testimony on the ultimate issue of whether the crime was committed for the benefit of a criminal

8    street gang.  See People v. Vasquez, 58 Cal.App.4th 494, 507–08, 68 Cal.Rptr.2d 135 (1997).

9    See also Cal. Evid.Code § 805 ("Testimony in the form of an opinion that is otherwise admissible

10   is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.").

11         In any event, this court has reviewed the transcript of Detective Stearns' testimony and

12   finds that the Court of Appeals' opinion was reasonable.  The gang expert stayed within the

13   hypothetical for the most part, and when he strayed on one occasion and referred to the facts of

14   the case, an objection was immediately sustained.  (RT. 1537-1548, 1542).  The expert's

15   testimony which referred to two younger defendants being directed by the older defendant to do

16   the crime for East Side Piru, (RT. 1548), was necessary to link the hypothetical to the facts of this

17   particular case.  The hypothetical cannot be posed in a vacuum, but as the court of appeals stated,

18   "must be rooted in the evidence of the case being tried, not some other case."  (Res't's Lod. Doc.

19   23 at 27.)

20         Thus, petitioner cannot show that the appellate court's denial of this claim was contrary to

21   or an unreasonable application of clearly established federal law under the AEDPA, and therefore

22   petitioner cannot prevail on this claim.

23   V.  Jury Instruction that an Aider and Abettor is "Equally Guilty" of the Crime

24         Petitioner claims that his due process rights were violated when the trial court improperly

25   instructed the jury that the defendant is 'equally guilty' of the crime committed by the perpetrator

26   which he aided and abetted, and that such language has since been excised.  If such language had

27   not been used in his trial, petitioner claims that he might have been convicted of a lesser crime

28   than attempted murder.

Petitioner raised this claim on direct appeal.  The California Court of Appeal rejected petitioner's claim as set forth in the following portion of the opinion:

> Defendants contend CALCRIM No. 400, as given to each jury in this case, is defective because it refers to an aider and abettor being "equally guilty" with the principal.  We deem this contention to be forfeited, and further conclude that any error was harmless.
>
> We previously have held that the failure to request a modification to this instruction in the trial court forfeits the precise contention raised in this appeal:
>
> > "Generally, a person who is found to have aided another person to commit a crime *is* 'equally guilty' of that crime. [Citation.]
> >
> > "However, in certain cases, an aider may be found guilty of a greater or lesser crime than the perpetrator.  [Citations]
> >
> > "Because the instruction as given was generally accurate, but potentially incomplete in certain cases, it was incumbent on [defendants] to request a modification if [they] thought it was misleading on the facts of this case. [Their] failure to do so forfeits the claim of error."  (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 (*Lopez*); see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163-1165.)
>
> We adhere to the views expressed in *Lopez* (which rejected contrary views expressed in *People v. Nero* (2010) 181 Cal.App.4th 504, relied on by defendants herein) and conclude the claim has been forfeited. [N.16]
>
> [N. 16] During deliberations, the Whitaker jury asked if was possible "to convict the other defendant of aiding and [abetting] the lesser included offense?"  The trial court replied:  "In this case you are charged to determine the guilt or innocence of two separate defendants.  You have been given separate verdict forms relating to each defendant, setting forth the questions you must answer as they relate to each defendant.  [¶]  You must separately consider the evidence as it applies to each defendant, and decide each charge for each defendant separately."  Contrary to Whitaker's claim, this does not avoid forfeiture because no modification to CALCRIM No. 400 was sought.  Moreover, the reply accurately emphasized that the jury had to determine each defendant's liability separately, further undermining the claim that CALCRIM No. 400 would have been misinterpreted, at least to the Whitaker jury.
>
> Moreover, the trial court instructed each jury with CALCRIM No. 401, which told each jury that aider liability required the People to prove a defendant knew of the perpetrator's purpose and shared the perpetrator's intent.  And defendants do not claim any error in the instructions defining the intent required for

1
2
3
4

the substantive charges.  Because we presume the juries would correlate the various instructions (see *People v. Sanchez* (2001) 26 Cal.4th 834, 952), they would not have used the "equally guilty" language to truncate their duty to determine each defendant's intent. Thus, any error in the "equally guilty" language was harmless.  (See *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119-1120.)

5

(Res't's Lod. Doc. 23 at 22-24.)

6

A.  Procedural Default

7

As set forth above, the California Court of Appeal concluded that petitioner forfeited this

8

claim of jury instruction error by failing to request a modification to this instruction with the trial

9

court.  Respondent argues that the state court's finding of forfeiture constitutes a state procedural

10

bar precluding this court from addressing the merits of that claim.  Respondent insists that this

11

claim is barred because in the Ninth Circuit the contemporaneous objection bar has been held to

12

be an adequate and independent state procedural rule, and in this case, the defense at trial failed to

13

request a modification of the aider and abettor instruction given.  (ECF No. 21 at 37).

14

State courts may decline to review a claim based on a procedural default.  Wainwright v.

15

Sykes, 433 U.S. 72, 97 S. Ct. 2497 (1977).  As a general rule, a federal habeas court "'will not

16

review a question of federal law decided by a state court if the decision of that court rests on a

17

state law ground that is independent of the federal question and adequate to support the

18

judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

19

(quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546 (1991)).  The state rule is

20

only "adequate" if it is "firmly established and regularly followed."  Id. (quoting Ford v. Georgia,

21

498 U.S. 411, 424, 111 S. Ct. 850 (1991)); Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003)

22

("[t]o be deemed adequate, the state law ground for decision must be well-established and

23

consistently applied.").  The state rule must also be "independent" in that it is not "interwoven

24

with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan

25

v. Long, 463 U.S. 1032, 1040–41, 103 S. Ct. 3469 (1983)).  Even if the state rule is independent

26

and adequate, the claims may be heard if the petitioner can show: (1) cause for the default and

27

actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider

28

the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749–50.

1    Respondent has met his burden of adequately pleading an independent and adequate state

2    procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.  Petitioner does not

3    deny that his trial counsel did not raise a contemporaneous objection to the trial court's issuance

4    of this jury instruction, despite counsel's objections and argument in regard to other proposed jury

5    instructions.  (RT. 1715-1735).  Although the state appellate court addressed petitioner's due

6    process claim on the merits and found that any error was harmless, it also expressly held that the

7    claim was forfeited on appeal because of defense counsel's failure to object.  Petitioner has failed

8    to meet his burden of asserting specific factual allegations that demonstrate the inadequacy of

9    California's contemporaneous-objection rule as unclear, inconsistently applied or not well-

10   established, either as a general rule or as applied to him.  Bennett, 322 F.3d at 586; Melendez v.

11   Pliler, 288 F.3d 1120, 1124–26 (9th Cir. 2002).  Petitioner's claim therefore appears to be

12   procedurally barred.  See Coleman, 501 U.S. at 747; Harris v. Reed, 489 U.S. 255, 264 n. 10, 109

13   S. Ct. 1038 (1989); Paulino v. Castro, 371 F.3d 1083, 1092–93 (9th Cir. 2004).  See Fairbanks v.

14   Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011) (finding that the contemporaneous objection bar can

15   be applied)

16   Petitioner has also failed to demonstrate that there was cause for his procedural default or

17   that a miscarriage of justice would result absent review of the claim by this court.  See Coleman,

18   501 U.S. at 748; Vansickel v. White, 166 F.3d 953, 957–58 (9th Cir.1999).  For the reasons

19   explained below, even if the claim was not procedurally barred, it lacks merit and should be

20   denied.

21       B.  Merits of the Claim

22   A challenge to a jury instruction solely as an error of state law does not state a claim

23   cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S.

24   Ct. 475 (1991) (habeas corpus is unavailable for alleged error in the interpretation or application

25   of state law); see also Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); Middleton v.

26   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  The standard of review for a federal habeas court "is

27   limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

28   States."  Estelle, 502 U.S. at 62.  In order for error in the state trial proceedings to reach the level

1   of a due process violation, the error had to be one involving "fundamental fairness."  Id. at 73.

2   The Supreme Court has defined the category of infractions that violate fundamental fairness very

3   narrowly.  Id.

4        In order to establish a due process violation, petitioner must show both ambiguity in the

5   instructions and a "reasonable likelihood" that the jury applied the instruction in a way that

6   violates the Constitution, such as relieving the state of its burden of proving every element

7   beyond a reasonable doubt.  Waddington v. Sarausad, 555 U.S. 179, 190, 129 S. Ct. 823, 831

8   (2009).  Petitioner must show that the ailing instruction by itself so infected the entire trial that

9   the resulting conviction violates due process.  Estelle, 502 U.S. at 72.  Additionally, the

10  instruction may not be judged in artificial isolation, but must be considered in the context of the

11  instructions as a whole and the trial record.  Id.  The court must evaluate jury instructions in the

12  context of the overall charge to the jury as a component of the entire trial process.  See United

13  States v. Frady, 456 U.S. 152, 169, 102 S. Ct. 1584 (1982).  Furthermore, even if it is determined

14  that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief

15  if the unconstitutional instruction had a substantial influence on the conviction and thereby

16  resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710

17  (1993), which is whether the error had substantial and injurious effect or influence in determining

18  the jury's verdict.  See Hedgpeth v. Pulido, 555 U.S. 57, 61–62, 129 S. Ct. 530 (2008) (per

19  curiam).

20       Respondent argues that despite a procedural bar, the state appellate court found that any

21  error was harmless.  In this regard, the court's additional instruction, CALCRIM 401, served to

22  correct any potential error of eliminating the burden to prove petitioner had the same intent as the

23  perpetrator.  This instruction informed the jury that petitioner must know of the perpetrator's

24  intent, share that intent, and intended to aid and abet the perpetrator.  (CT 57.)  That instruction,

25  read in conjunction with CALCRIM 400, which required aiding and abetting the perpetrator, and

26  instructing that an aider and abettor is "equally guilty of the crime whether he committed it

27  personally or aided and abetted the perpetrator who committed it," (CT 56), explained to the jury

28  how to determine petitioner's intent as an aider and abettor, and defined and detailed the

38

1    circumstances under which petitioner could be found liable for the same crimes as the perpetrator.

2    While there may be circumstances where an aider and abettor may be liable for a lesser crime so

3    that CALCRIM 400 may be improper, that is not the case here.  There was overwhelming

4    evidence that petitioner had the intent to commit first degree attempted murder.

5          Furthermore, in light of the trial court's instructions which were read together and clearly

6    explained the intent requirements for aider and abettor as described above, the California Court of

7    Appeal's conclusion that any instructional error was harmless is neither contrary to, nor an

8    unreasonable application of, Supreme Court harmless error jurisprudence.  See Fry v. Pliler, 551

9    U.S. 112, 119, 127 S. Ct. 2321 (2007) (in order to grant habeas relief where a state court has

10   determined that a constitutional error was harmless, a reviewing court must determine that the

11   state court's decision was "contrary to" or an "unreasonable application" of Supreme Court

12   harmless error precedent, and that the petitioner suffered prejudice under Brecht from the

13   constitutional error); Mitchell v. Esparza, 540 U.S. 12, 17–18, 124 S. Ct. 7 (2003) (same);

14   Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005) (same).  Petitioner did not suffer

15   prejudice as a result of any potential error, and the appellate court's decision was neither

16   "contrary to" or an "unreasonable application" of harmless error precedent.  Therefore, the giving

17   of CALCRIM 400 with the "equally guilty" language did not violate petitioner's right to due

18   process, and this claim should be denied.

19   CONCLUSION

20         For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

21   Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

22   appealability when it enters a final order adverse to the applicant.  A certificate of appealability

23   may issue only "if the applicant has made a substantial showing of the denial of a constitutional

24   right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

25   a substantial showing of the denial of a constitutional right has not been made.

26         Accordingly, IT IS HEREBY RECOMMENDED that:

27         1.  Petitioner's application for a writ of habeas corpus be DENIED; and

28         2.  The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 3, 2015

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:076/Pres1991.hc